Case number 1535, Christine Suzanne McNerney v. It's her. Allamuradov. That's good. Pretty good. We have three texts. All right, three texts. The LLC and Grand Transportation Corporation. Okay, well, would the lawyers who are going to argue the case please approach the bench and introduce yourself to the court, please. My name is Heather Adams on behalf of Suzanne McNerney. John Nguyen on behalf of 303 Taxi. My name is Mark Palakidis on behalf of Grand Transportation. I'm sorry, I didn't hear your name. Mark Palakidis on behalf of Grand Transportation. Now, in regard to 303 and Grand, are you guys going to split your time or how are you going to do this? Your Honor, we had talked about splitting it. If there's 20 minutes, it would be 15-5. If it's 15 minutes, I guess 10-5, Judge. We're very flexible. If the arguments go one way, then that's fine with me if 303 takes more time. Does the court want to hear the cross appeals altogether? Yes. Okay, let's proceed. May it please the Court. Ms. McNerney, Suzanne McNerney, is my client, and she was attacked in a taxi cab on August 27th, or 22nd, 2012. And a woman should be able to take a taxi, day or night, without fear of being attacked. I know, I know, but that's not the issue here. This is an issue of agency, and that's what you should focus your argument on. Correct. And along those lines, I have a question. Sure. She gives a deposition here, and she indicates in the deposition that the reason she called 303 is because her in-laws had provided her the information regarding 303. But then, later on, she provides an affidavit, which in the affidavit, she indicates that the reason she called 303 is because they were allowed, dependable, and that was the basis for her reaching out to them. So we have an inconsistency in regards to the deposition in her affidavit. So which one should we consider? Justice Reyes, I would not consider that an inconsistency. What I would say is that she has 10 years of using the same taxi cab. She has experienced the customer service they provide. She has been able to use their website that's branded. She's been able to do all of these things over the course of 10 years and develop her own perspective as to whether they provide safe, reliable, and reasonable service. Yes, she may have been recommended 303 Taxi Cab at some point during that 10 years, but that does not negate her own perspective and her own belief that they provided these services. And what was her perspective? And her perspective was first that she had no idea that they were sending independent contractors to pick her up. Her perception was she believed that they provided this safe and reasonable service based on her experience riding in these taxi cabs over the course of 10 years. And in this particular case, looking at the Illinois common law, what we need to do is look at the realities of the experience that she had and the realities of the relationship between 303 and that taxi cab. And on August 22nd, 2012, Ms. McNerney went to their website that was branded. At no point was she told that this was an independent contractor relationship. There's no ordinance out there that prohibited 303 from sharing that information with her. So she was never notified or given reasonable notice when they showed up to pick her up on the 22nd of August. So what's the agency relationship that you're asserting here then? This is an actual agency relationship. We're asserting two. And so this is an actual agency case. This is also an apparent agency case. As to both or just the 303? 303 would have both. So we're looking at their actual practices and how they control the conduct of the individual taxi cab drivers. And we're also looking at how they held out the individual taxi cab drivers to be their agent. For the first ‑‑ And what about Grand? Grand Transportation, we're looking at actual agency and how they directly control the conduct of drivers. Are you talking about an apparent agency? I am. I'm talking about both. So with regard to 303 ‑‑ When you say both, apparent agency is one. What's the other one you're talking about? Actual common law. Actual agency. Actual agency. So I'm ‑‑ Actual agency, okay. Now, an actual agency other than through an agreement has to be from acts of the principle. What acts of the principle do you have here? Starting with 303. The acts of 303 is that they actually trained the drivers when they came on. They hired. They had the authority to hire. They had the authority to fire. They had the authority to discipline. And the record in this case demonstrates that they not only vetted Mr. Almoduroff when he came in. He had to fill out an application. They ran the background check. They also trained ‑‑ They argued that was voluntary. They didn't do it as a basis of their contractual agreement with the driver or with Grand. They said it was just voluntarily. Sure. We're looking at these actual agency cases in respect to 303 since I began with them. We're looking at the actual realities of the way they engaged with these drivers. It's not necessarily this is a voluntary act, but we look at what is the economic realities and the practical realities for these drivers. 303 reserved for itself a number of powers within the dispatch agreement that it entered into with Grand Transportation that provided it with the authority to go and inspect the vehicle whenever they wanted to inspect the vehicle. They did not have to have the permission of the driver to do that. 303 also gave them training on how to engage with customers. Don't talk about certain political issues. Stay away from issues of sex with your customers. They also were the ones who responded to customer complaints. So if you as a taxicab passenger complained about the service you received from a taxicab driver, you would call 303. 303 would respond and they would take appropriate action with that driver. So this idea that these things were voluntary is not represented by what actually occurs with the way the driver is able to engage in their day-to-day activities. The drivers are not able to get a car if they don't go through 303. The drivers can be denied a car if they do something that violates what 303 considers to be their courteous responsibilities or their actual or if they get lost. So, I mean, there's a number of things that you look at to see whether or not there's this actual relationship. Was there anything on the exterior that would lead someone to believe that it belonged to 303 or to Grant? Absolutely, and I think those are some of the facts that we support our apparent agency theory on with those as well. But in terms of just the direct agency theory, yes, they drove 303-branded cars. They were turquoise and white. They had a large logo on the exterior of the taxicab. These are the cars that they sent out and dispatched when a passenger called or logged online to get a cab. Customers talked directly to 303. They never talked to the driver until the driver actually arrives. 303 confirms the trip that the passenger is taking. So, yes, on the surface, a customer would have no clue or no idea that they're working with an independent contractor because there's nothing to suggest that this is an independent contractor relationship. Are there any visible disclaimers on the vehicle at all? No, there's not. Now, 303 might argue that it says affiliate on the side of the taxicab, but I believe there is a case, the Jacobs case, which was just announced by this court that said, you know, having affiliate or anything on the outside or exterior or having a placard on the inside of your cab that says, you know, this is owned by a certain taxicab is not necessarily going to put a person on notice as to the nature of the relationship. And, in fact, it's an issue of facts that should be resolved by a jury. And here affiliate would not put and did not put Ms. McNerney on notice that she was being picked up by an independent contractor. And throughout the 10 years, she never knew she was being picked up by an independent contractor. The Jacobs case pertained to a city taxicab. And here we're dealing with a cab that was utilized in Winnebago. So don't we have any differences within the ordinances with regards to the City of Chicago and Winnebago? Well, not according to 303. I mean, 303 argues in their brief that, you know, the branding and the logos on the outside of the taxicab can never be used as indications of an agency relationship because unnamed ordinances required that they had this uniform presentation. And what we take from the holding in Jacobs is, look, you took voluntary actions to pick out the color that you chose, the turquoise color of your cabs. You took voluntary actions to make the logo that you put on all your taxicabs. And you took all these actions without the mandate of law. And that same principle holds in this case. 303 did all of these things without being mandated. And 303 at no point made an effort to indicate to their passengers that they were sending independent contractors to pick up their passengers. But I don't want to focus completely on 303. So if I may go to Grand Transportation. Similarly, Grand Transportation controlled the activities, directly controlled the activities, as well as had the right to terminate their drivers just like 303 did. And in fact, Grand Transportation's vice president states that he made a decision to terminate the taxicab driver in this case's employment once he found out about the allegations of sex assault, the sexual assault. And in fact, that same vice president said that he has a sole authority to hire and to terminate taxicab drivers. Now, Grand's argument that they don't control the day-to-day activities is belied by the fact that Grand Transportation's representatives and vice president make sure that they go weekly to 303's offices to engage with those same drivers. They give instructions. They troubleshoot problems. They have conversations with them that directly reflect on their day-to-day activities. And every common law agency case that you will find, regardless of whether it asserts nine factors need to be met or 15 factors need to be met, you will find that direct control of the activities is the preeminent factor that should be looked at at these courts. So Grand Transportation suggests that we have failed to meet the WESCAB nine-factor test. And they identified their own individual factors that they say that we have not met in this case. But the Davila case is directly on point with their 15 factors as to what we presented in our briefs below. Every single factor in the Davila case was represented in our case. And the Davila case also says these are the most important factors that you should look at. And it did not look at any of the factors that Grand Transportation claims were dispositive in this case. Grand Transportation and the trial court below aired a suggestion that our client had to meet every single factor that was present in every single common law agency case that has ever been decided. And that simply is not our burden. Our burden is to provide sufficient facts that demonstrate that there is an agency relationship or puts into question whether there's an agency relationship. And we have done that. Grand Transportation executed a lease agreement directly with the driver in this instance. And that lease agreement provided Grand Transportation with a number of reserved rights to control the activities, including the right to inspection. In fact, Grand Transportation's agreement with 303, because 303 is a dispatch company and Grand Transportation leases the vehicles, provides that Grand Transportation can go in and inspect the vehicles just to make sure that the dispatching radio service is working. So all of these abilities to seize a vehicle, abilities to inspect the vehicle, direct contact with the driver on a weekly basis, telling them how they should engage with customers reflect this agency relationship. And at summary judgment level, you know, it's an exception to the rule that you find that as a matter of law, there is no agency relationship. That is the exception. But generally speaking, it is a question of law and fact that should be reserved for the jury upon proper instruction. And here we have provided a number of contacts that demonstrate that 303 and Grand Transportation both control the daily activities of the driver. Before I conclude, can you just touch upon briefly the issue of the supplemental pleading? The supplemental pleading was a FOIA request. It's based on a FOIA request. And we had gone through discovery and at no point did Grand Transportation or rather 303 Taxi disclose to plaintiffs that, yes, in order to work in Winnetka, there needs to be a disclosure provided by the taxicab company that is the employing unit of that driver. And when a driver goes to get a license within Winnetka, they must have the employing unit, the 303 Taxi, state that, yes, this is my employee. This application was on file the entirety of this case and never presented to plaintiffs in this matter. We filed a FOIA request after the trial judge had issued her written order that said we're going to have our filings. And I hope I'm getting to your point. Well, the point is that you sought to amend whatever you said, but you called it a supplemental pleading. So why did you refer to it as a supplemental pleading when it actually was an amendment? In terms of the supplement, we wanted, well, I think pleading is used as an overarching term. Our main purpose of supplementing that was that there was a disclosure and affirmation by 303 that this is our employee. And this particular document was not presented during the course of discovery. And as a party in this particular case, 303 had the duty to supplement its own discovery with these type of documents. And it wasn't until the last one that we discovered it for ourselves. And so our purpose in supplementing it goes directly to the actual agency and it goes directly to the apparent agency in this case. But it pertained to an issue, not an issue, but it pertained to something that occurred before the original pleadings were filed, correct? I mean, this request that you made pertained to some actions that took place before the actual original complaint was filed, correct? Correct. This had to do with the application that was submitted by the taxi cab driver to be able to operate in Winnetka. This document was on, was in the records of the police department there that issues these licenses. When we submit, when we sent our discovery, written discovery to 303 asking to provide to us all applications, all information that demonstrated the relationship and contracts between the driver and 303. And this was never produced. So yes, the application was prior to the complaint, but was discovered after. In conclusion, what I want to leave this particular court with is actually a statement from the Jacobs case. And in the Jacobs case, there was a lot of reliance on the restatement third and defining what the agency relationship should be. And one of the statements that was placed in that particular opinion was a principal may not choose to clothe someone with the trappings of agency and then determine at a later date what are the consequences of that behavior offers an advantage. And that's exactly what has happened here. Whether you look at it under a common law direct contact context, both Grand Transportation and 303 governed the hiring, the firing, the disciplining, and the termination of the driver in this particular case. When we look at it as an apparent agency theory, 303 taxi never disclosed that it was operating with independent contractors, ensured that all its branding on all of its cars looked exactly the same, and that there was no way that you would know that it's a stranger that's picking you up. And for the record, Jacobs was not in your brief, correct? Jacobs was decided in March of this year. Okay. So this opinion was not available to us when we drafted our brief. Okay. Thank you. Well, you can move to cite it as additional authority if you'd like. I would like to. I would like to move to cite this as additional authority. I will. I will. Thank you. Good morning. Good morning. Just because it's on the table, I'm going to start a little bit out of order with the issue of the supplemental discovery. Plaintiffs Counsel made the representation that 303 affirmed that the driver was an employee. That's absolutely false. There's nothing in the record before you, and there's nothing in the record anywhere where 303 did that. There's a village required that the driver himself make an application to drive a cab there. He filled out the form, and it says you can have either an application from your employer or an ID card. We didn't produce any such document because there is no such document, and that's reflected in the FOIA response where the village didn't have any such document because it never existed. But the trial court was well within its rights in not even entertaining that issue because that discovery had been closed back in May of 2015. F1s had been closed in 2015. And then the trial court also indicated when it received the briefs, in its order, that no additional documents or discovery will be accepted. So two days before the hearing on the summary judgment motion, the plaintiff moved to submit it. That was stricken as being improperly spindled and brought it on the day of the ruling. And the court ultimately entertained the motion and said, no, this is beyond the cutoff. But then I went on to analyze it anyway, saying it wouldn't have changed my mind anyway for the reasons I just stated. And it was fashioned as a motion to supplement. Yes. Under 216, right? Well, in the response brief, they said it was 216 as an amendment to a pleading, but it wouldn't be. It would just be a motion to amend or supplement the motion on file. So I didn't understand that myself. But I also have to get to the threshold issue, I think, in this case, and that's the court's jurisdiction to even hear the post-trial motions because it's undisputed that the post-trial motion was due on October 26. And it would have been due the 25th, but because that fell on a Sunday, it fell to the Monday. At 1130, plaintiff filed the motion to reconsider the granting of the summary judgment motion. However, simply submitting something electronically is not an electronic filing under the general administrative order 214-02, which is very clear and express and has no ambiguities in what is required for a filing. One has to be submitted, in which case you'll receive a notice from the court that they received it, and then you also have to – it has to be accepted, in which case you'll get a notice from the court that it has been, in fact, filed. So my question is, because this same argument was raised before the trial court, and the trial judge, with their discretion, decided to go ahead and hear the motion anyway. So how did the trial court abuse its discretion? Because the trial court agreed that the remedy of non-pro-tump was inapplicable. So it simply said, well, I'm going to deem it filed retroactive to the day. Well, there's case law that basically says the trial court can't do that once it's lost its jurisdiction. Specifically, I'm talking about the Keener case, Keener v. City of Huron, where somebody did not – or a case was dismissed, and there were some reasonable reasons why the plaintiff did not know it had been dismissed, went to refile a motion seven months later to vacate, and the court said, okay, I'm going to allow the motion, and I'm going to deny it on its merits. But that wasn't an e-filing case. It was not an e-filing case. You know, the e-filing is new, and there's going to be certain problems with it. And one of those problems is going to be that a motion may be rejected for dollars. It may be the wrong dollars, as what happened here. And I think you're better off to argue something other than that, because people are not going to be precluded because the e-filing made an error, or they made an error with the e-filing. I mean, I'm just going to tell you that out loud. I'll move on then to the issue of apparent agency, which seems to be kind of directed back 303 here. The Jacobs Court, which just came down, kind of affirmed what the trial court was saying. An affirmative for apparent agency, you have to look at each case on a fact-by-fact basis and look at the three criteria. Was there a holding out? Was there a belief that the person was an agent and employee? And then was there detrimental reliance? Did you rely on that particular holding out for your actions? In this case, the trial court looked at everything here, looked at all the depositions and determined that there was not, and she was entirely correct. Here, the cap says 303 taxi as the municipalities require. It also says it's a 303 affiliate owned by someone else, and that's at page 487 in the record. That was testified to by Mr. Kahn. So there is a disclaimer in the draft. That was the belief that the plaintiff had here. I mean, I understand what you're saying is that it indicated that it's an affiliate and owned by someone else, but how do we know? Part of the record doesn't show that. That was her belief as well. We don't know that it was her belief because in her deposition, she indicated actually that she didn't have a belief. In her deposition, she said she didn't have an understanding one way or the other whether the person was an independent contractor or an employee. That's at page 515 of her deposition testimony. But she did say in her deposition that she relied that the drivers that were sent were not going to attack her. I would think that that would be a reasonable reliance for any young lady who's going in a cab with somebody she doesn't know. That would be a reasonable reliance if a driver were going to attack you, but that's not a word or an action that you're relying on from 303 taxi. So that's the critical thing that the trial court focused on, and that what I believe this court needs to look at because this case is very similar to the Oliveri-Brooks v. Remax case where the agent was in a crash with a potential customer. He's handing out cards that say Remax. He's got a policy, a handbook policy that talks about all the things he should do. She believes he was a Remax agent, and he's answering the phone Remax. But the court said no, that's not enough. Just because he speaks the same language as you and that he did work for your friends, that doesn't mean that you chose him because of your belief that he was an employee. But Jacob says it's not necessarily the words or the conducts of the agent, but it's the word or the conducts that we look at in terms of the apparent person. Exactly, which is the same thing as the court said in the Oliveri-Brooks case because the court was looking at the fact that the plaintiff wasn't relying on anything that Remax said to create this impression. She picked him because her son recommended it. Here, the evidence in the record before you is that the plaintiff picked 303 because her ex-in-law recommended it to her and that she continued to use that because the number was in her phone and it was easy to remember. What about her affidavit? Her affidavit completely contradicts that. So I don't consider that. You should consider it. And there's case law that I cited in the brief that says you should not consider that. The trial court indicated that it still does not give her the evidence that she needs to connect the alleged conduct by 303 to the detrimental reliance. So the self-serving affidavit, after she gives all this deposition testimony, the system will come to a halt. Everybody has to be re-deposed every time they get served with a motion for summary judgment. That's why you can't do it. And here, that's exactly what she did do. But the testimony, even in the affidavit, doesn't connect the acts of 303 to why she called for a cab in that particular cab company on that day. As the contract notes, 303 is a dispatch company. It's not a cab company. It does not control how the drivers go about doing their business, nor can it. What about the issue that they raised that 303 vets them in terms of their background and so on and so forth? And that's a good segue into the actual agency allegation. 303 does not hire them. The contract is with Grant. It's a very detailed contract that sets forth the criteria that I'm sure Grant's attorney will address. But we have no direct contract with them, and we do not hire them. Nor do we vet them. What we do is the municipalities require a background check. We direct the drivers at this Alamirado to a third-party vendor that they all seem to accept accurate biometrics, and the driver goes, gets fingerprinted, gets a criminal background check, and then the driver brings that to the municipalities. We do get a copy that we keep on file, and we produce that. But we don't vet these drivers. We don't hire them, and we can't fire them. So when the background check comes back as this is not a person you want out there on the streets, who makes that determination? Is it 303 or is it Grant? Well, we would tender that to Grant, and Grant would make the determination whether they're going to at least a cab to them or not. But the person would not be able to operate a cab in the municipalities because it's a municipality requirement that they pass this background check. So that's hardly an indicia of control by us. We don't stop them from doing that. Even in this case when we were advised, we couldn't prevent him from driving a cab. We couldn't prevent him from picking up customers. All we can do when we're advised of this attack is stop our dispatch and let Grant know that, hey, we've got to stop this dispatch. But there's no issue of control. We don't hire. We can't fire. We can't make him come in for inspections. We don't have a contract with them. So there's no basis in the records for these statements. The Jacobs case was very fact-specific about a person who had what the person called quirks. He'd get off the line so that he could take the yellow cab. He compared the yellow cab to other cases, other cab companies. He had a bad experience on safety with another cab company. So there was a lot of interesting fact-specific runs where he could take the yellow cab was relying upon yellow cab. And yellow cab in terms of the logo, they specifically chose an older logo that was equated with a time and era when cab companies owned them. There's no evidence here that 303 did that. In fact, the evidence says that while it said 303, it also says it was owned by someone else. It was an affiliate of 303 as reported. So the person could market themselves and their own business on the exterior of the cab. Was there any ordinance in Wonecta that required certain logos or markings on a vehicle? Not only Wonecta, but I believe Libertyville and some of the others as well. Each municipality does have its own requirements. And so what 303 would try to do is have a generic one to kind of make it to meet all of the various suburban municipalities. Because it didn't just serve Wonecta. It served more than I think seven different suburbs up there. So it did have to meet that criteria. Thank you. Thank you. Good morning again. It may have pleased the court. I'm going to be very brief and just talk about things that relate to grand transportation. Mr. Justice Reyes asked a question about how does it work with the criminal background checks and who makes the decision if it comes back bad. Well, a driver can't get a chauffeur's license if it comes back bad. And if he can't get a chauffeur's license to present to Grand or any other affiliate, he's not going to drive for them. So it's really that decision is made by the municipalities if there's a bad or a hit or a positive negative criminal background of any kind, which there wasn't here. And that kind of gets to the agency argument. I think what I get from the plaintiff's attorneys today is that there's no apparent agency claim left against Grand. I think that's gone. And I think a lot of the comments about the Jacobs case don't apply to my client anymore. And the record bears that out because what Ms. McInerney testified to twice in her deposition is that she had never heard of grand transportation before the day of her deposition. Her affidavit, whether it's contradicted or not, doesn't mention grand transportation at all. So the plaintiff has been reduced to, I'll call it an actual agency case, because that's what we're talking about. And that starts with the lease between the driver and Grand, which not only labels the driver as an independent contractor, but the actual conduct of the parties is consistent with that. In fact, there's nothing that the parties did here that's inconsistent with that lease. The driver is working for himself. He's just leasing a cab and pays a fixed weekly fee to Grand, whether the driver makes $10 that week or whether he makes $10,000 that week. The amount of the lease doesn't change. In other words, Grand does not participate at all in the profits or the losses of the driver. There's only two factors, really. Whether we look at West Cab or we look at the other cases, there's really only two factors here that affect control in any way, and they're pretty weak. One is the color of the cab or the consistency of the cab, which we've talked about the reasons why that's necessary. And the other one is this idea of termination. In this case, it's mutual. What about the fact that your vice president says that he makes the determination whether who works and who doesn't work for Grand? Well, I don't think he uses the word works or employs. He's basically talking about who can lease. And, again, if he sees somebody that has a bad criminal background check or can't get a chauffeur's license, they call them in the suburbs, then they can't lease. And it's really that simple. They don't delve much further into these guys' backgrounds because the municipality does it for them. But, you know, all these cases, whether it's construction, whether it's transportation, or whether it's owner-operators, it always comes back to retain control over the means and methods of the work. I mean, that's Section 414, right? So what Alan Muradov does every day and how he decides to go about it is really up to him. They avail him of a dispatch system that he can log into, but he's not required to use it. A fare could pop up on the dispatch at O'Hare, but he's not required to go get it. He can go use this thing. Nowadays, they all use these vehicles like an Uber, and they might even use the dispatch system. It's all about providing a vehicle. Just if I own a strip center and I lease a storefront to somebody, I might retain a right to go look at it to be sure it's clean inside and it can pass a building inspection, but I don't tell the store how to operate or who to serve or what prices to charge. And even if I put on a marquee Joe's Cleaners, it doesn't mean that I'm directing Joe on how to do the dry cleaning at my storefront. So it isn't some, I don't believe it's some corporate scheme to fraud customers or make somebody unsafe. It's a leasing company. They lease vehicles. The drivers do what they want. My guy just wants to get paid. Nothing illegal because there is a right to end the lease, and I don't think that that creates any special duty. If you believe the plaintiff on the policy arguments, they almost want to create a new tort for taxicabs and for females, and agency-wide thinking is fine the way it is, and it addresses the liability pattern here, which is fine. So how would you define granted? Is it a common carrier? Judge Flanagan made that finding, and I don't think that's an issue on the appeal, but it probably is. But she also made a finding that if there's no agency, then all those duties don't apply. Now, if there were agency, and we know this from that Pace bus case that's relatively recent, even if an assault takes place outside the vehicle or really outside the scope, I think that assault took place in the man's apartment, the common carrier is still on the hook, and I think that's how it should be. And I think that's the kind of protection that counsel is talking about for passengers, female or otherwise. So as for grant, I think that covers more or less the, oh, the supplemental pleading was the only other thing I want to talk about because there's no claim here that the plaintiff somehow was put in a bad position because of anything Grant did. There's no discovery of violation alleged against Grant. There's no evidence in the record that Grant had these documents or possession or control over them, even if those documents made a difference, which they don't. But I don't think there's any reason why the case should go back to the circuit court just on that reason. So on behalf of Grant, and I'm not going to address the cross-appeal based on the comments of Mr. Justice Gordon, but I'm going to ask that the case be affirmed on assembly judgment in favor of Grant. Thank you. Thank you. What the taxicab companies are arguing is that we find as a matter of law that there is no issue of fact. And the fact that we're standing here before you today disputing whether an affiliate gives notice to a person with an independent contractor relationship, as to whether a vice president who declares that he can terminate anyone whenever he wants to has that full authority, is at question. It demonstrates that there are significant questions of fact with regard to the nature of the relationship between 303 Taxi and Mr. Amadorov and Grant Transportation and Mr. Amadorov. And I just want to note a few of the factors that were at issue here, specifically for Grant. They not only provided him with a taxicab, a taxicab medallion, a meter, a taxidome light on the roof of the car, the lease agreement specified that he was leasing a vehicle solely to be used as a taxicab. The cab was a part of a uniformly painted fleet that he could not change. They prohibited him from changing the appearance. They prohibited him from subletting the vehicle. They required him to issue coupons and meter printed stickers that had 303's logo on it. They instructed him to be courteous to passengers. And, as the vice president said, they had the right to terminate him. These are all factors that were found compelling and dispositive in the Avila case. The factors that Grant Transportation has relied upon are secondary factors. And sure, they are factors that demonstrate control. But there is no case law that says you must apply these five factors or these ten factors to find an agency relationship. And, in fact, what the cases say is that no one factor is dispositive. And there are a number of factors, economic, direct, and otherwise, that you can look at to establish this agency relationship. Well, we have done. How about the fact that your client never heard of Grant? The fact that she never heard of Grant does not take away the fact that Grant Transportation, on an actual agency basis, directed the actual activities of the drivers on a day-to-day basis. The drivers received instruction from Grant Transportation representatives. They took their problems to Grant Transportation representatives. So the fact that she has no knowledge of them does not dispute whether there is actual control or Grant Transportation has actual control over the day-to-day activities of the drivers. And I also wanted to go back on 303's mention of the Oliveri case. The Oliveri case in Jacobs. And Jacobs specifically said the Oliveri case was distinguishable. It did not apply in Jacobs. And it didn't apply in Jacobs because Jacobs is an apparent agency case. Oliveri is an actual agency case. And so to the extent that 303 is conflating the actual agency argument and the apparent agency argument, I would submit to the court that it has no application in the apparent agency context. But what Oliveri is also, it is also an enterprise integration case. We're looking at two businesses. We're looking at, matter of fact, different levels of agency. So in the Oliveri case, we had an international company. We had a regional company. And then we had the little guy below. What they are trying to show is whether there was an agency relationship between the international company and the regional company and whether the international company could go through that regional company and direct the day-to-day activities of the individual employee. That is highly different than what we have here. We have a direct relationship between Grant Transportation and the driver or 303 and the driver. So I would submit that that case is not applicable in this action as well. So I leave with this. There are far more than two factors that were presented to the trial court below. And there are so many questions that still exist, even as we argue before you, as to the nature of the relationship between Grant Transportation, 303, and Mr. Amadorov. We are suggesting that Ms. McNerney, like in the Jacobs case, has a right to a jury trial because there continue to exist factors that are in question as to the nature of this relationship. And that's why Jacobs is also fairly distinguishable because the outcome or that case looks at what happened after trial. There is at least a question of facts here. They directed how they did their work, when they did their work, and they had the right to fire them. Thank you very much. I want to thank both parties for their excellent briefs and arguments, and we'll take this case under advisement and the court will be adjourned.